# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### ABINGDON DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| | ) | Case No. 1:04CR00056-012 |
| | ) | |
| v. | ) | **OPINION AND ORDER** |
| | ) | |
| **DONALD RAY MATNEY**, | ) | By:  James P. Jones |
| | ) | Chief United States District Judge |
| Defendant. | ) | |

*Thomas J. Bondurant, Jr.,  and Jennifer R. Bockhorst, Assistant United States Attorneys, Roanoke and Abingdon, Virginia, for United States of America; Charlie R. Jessee, Jessee, Read & Ely, P.C., Abingdon, Virginia, and John Y. Merrell, Jr., Merrell & Merrell, PC, McLean, Virginia, for Defendant Terry Allen Keene.*

The defendant Donald Ray Matney has objected to the calculation of his guideline range for sentencing purposes.  This opinion supplements the rulings of the court made at the conclusion of the hearing held on his objections.

## I

In this prosecution, dubbed "Operation Big Coon Dog" by the government, sixteen defendants, including seven public officials or employees, have been convicted of federal offenses primarily arising out of bribery and bid-rigging schemes in Buchanan County, Virginia.  As explained in the presentence investigation report ("PSR") prepared by a probation officer of this court:

While there are several instances of corruption involved in the conduct of the defendants, the majority of the criminal conduct in this case began following the "Hurley Flood of 2002" and some minor floods which occurred in the spring of 2003. Hurley, a small community in Buchanan County, Virginia, lies within the Knox District and the supervisor during the time frame of the illegal conduct was Stuart Ray Blankenship.

After a series of heavy rains on May 2, 2002, Buchanan County was seriously flooded with damages totaling approximately 50 million dollars and the loss of two lives. The hardest hit area was near Hurley in the Knox district. This damage included the destruction of houses, businesses, roads and bridges. The subsequent cleanup work involved removing flood debris from the creeks so that they would not become obstructed and flood again; to rebuild damaged roads and bridges; and to demolish any unsafe structures.

Within days of the flood, the Federal Emergency Management Agency (FEMA) began working with the Virginia Department of Emergency Management (VDEM) to establish a public assistance program to reimburse Buchanan County for damages caused by the flood. The process calls for the county to initially pay the contractors and apply to VDEM for reimbursement for a particular project. If VDEM approves the project, the application is sent to FEMA for approval, if FEMA approves the project, the federal agency pays 75% of the cost to VDEM, who adds 23% of the cost and wires the funds to the county. The county is responsible for the final 2% of the cost, which was offset by a handling/management fee of 2% paid to the county. In relation to the Hurley flood its' agencies submitted 71 projects totaling approximately $5 million which was approved by VDEM and FEMA. The county disbursed an additional approximate amount of $2.1 million that has not yet been reimbursed by VDEM or FEMA. Therefore, the transactions involved in the instant offenses total approximately $7.1 million.

Initially FEMA and VDEM contracted with the Army Corps of Engineers, who subcontracted with Disaster Recovery Contractors (DRC) of New Orleans for debris removal from the creeks. County officials, led by Stuart Ray Blankenship, accused DRC of padding its

tonnage of debris removal by randomly digging and hauling off dirt and rocks, rather than removing destructive debris from the creeks. In addition, the county officials were upset that DRC was not hiring local contractors. By June 2002, FEMA agreed with the county, refused to pay DRC a $500,000 payment, and turned over cleanup operations to county officials. However, by the time DRC was relieved of duties on June 21, 2002, it had received payments of approximately $3.2 million.

After the county became authorized to award contracts for cleanup operations, bridge repairs, construction and demolition, FEMA approved project applications if they were "reasonable" and the process of awarding a contract "complied with state law." The county board of supervisors decided that the supervisor of each district could unilaterally award contracts in that district for emergency work and could accept low bids of three contractors/participants in non-emergency work. However, the distinction between emergency and non-emergency work was not clear. In addition, the bidding process was not open, as the supervisor could choose which three contractors were to bid on a certain project. This process opened the door to bribes and bid-rigging. Supervisor Stuart Ray Blankenship of the Knox district accepted cash, expensive coon dogs, the construction of a coon dog kennel, a dog box for his truck, a motor, motor vehicles, ATVs, clothing, food, vacations, and a firearm to influence the awarding of contracts. Supervisor James Ralph "Pete" Stiltner, Jr., of the Rock Lick district accepted cash, favorable land transactions, favorable equipment transactions, clothing and a large screen TV to entice the awarding of contracts and cover-up illegal activities. County Coal Road Engineer Kenneth Morris Hale accepted cash and assisted Stuart Ray Blankenship obtain a motor. County Emergency Coordinator David Mathias Thompson accepted cash and clothing for rendering aid in the awarding of contracts. FEMA employee Gary Ray Moore accepted cash, a firearm, NASCAR tickets, football tickets, tires and construction materials to induce FEMA to keep the flow of federal money unimpeded and to "look the other way." County Road Inspector Ricky Allen Adkins was allowed to submit falsified expense and time records because he fed the coon dogs and cleaned out the kennels belonging to Stuart Ray Blankenship, as well as mowing his lawn and bringing him lunch. The remaining defendants are

-3-

the contractors who paid the bribes and rigged the bids. The specific details are as follows.

. . . .

In the summer of 2002, Hale approached Stephens and requested that a $4,000 debt at Vansant Lumber be eliminated in return to receive a contract to construct a bridge. Stephens forgave the debt. After completion of the bridge, Stephens gave Hale $1,000 in hopes of receiving additional bridge work. In June 2002, after the county took over awarding the flood contracts, it was decided to bid out six separate geographic sites in the Knox district for cleanup operations: four of the sites being locations where debris from the flood needed to be removed; one site where all the material and debris would be brought and sorted, and one site designated for dumping. Stuart Ray Blankenship did not advertise for bids and personally chose the contractors he allowed to bid on these sites: Donald Ray Matney of D&R Contractors; Earl Jackson "Roho" Lester, Jr., of Leet Construction Company; Kenneth Joseph Stephens of KJ Stephens and Associates; and Terry Gene Clevinger of Terry's Construction Company.

Blankenship told Stephens to meet with Clevinger to arrange bids, and told Matney that "you boys ought to get together and divide this up."

The four contractors, acting in concert, agreed that Matney was to receive three of the sites, Stephens was to receive two of the sites, and Clevinger was to get the contract for the reduction site. Terry Clevinger testified that Joe Stephens even filled out the bids submitted by Earl Lester and him. Lester's payoff for submitting high bids was to work as a subcontractor for Matney. When the bids were delivered and opened on July 18, 2002, Matney won the bids on all the cleanup sites and the dump site, and Clevinger won the bid on the reduction site. However, since Matney was the only one to bid on two of the cleanup sites (Sites 3 & 4), Blankenship declared those two bids to be invalid and opened them for rebid a day later. A perfect example of the corruption of the offense is reflected in these bids. The original bids for sites 3 and 4 were $177,780 and $219,016, respectively. However, the bids

submitted by Earl Lester, Terry Clevinger and Joe Stephens the very next day were substantially higher than the bids submitted by Matney the previous day. The low bids, submitted by Joe Stephens, were in the amounts of $204,960 (site 3) and $253,333 (site 4). The bids submitted by Lester and Clevinger were higher, as agreed by the parties. The accepted bids on these sites were as follows: cleanup site #1 was awarded to Matney in the amount of $124,767; cleanup site #2 was awarded to Matney in the amount of $140,280; cleanup site #3 was awarded to Stephens in the amount of $204,960; cleanup site #4 was awarded to Stephens in the amount of $252,333; the dumping site was awarded to Matney in the amount of $279,540; and the reduction site was awarded to Clevinger in the amount of $288,674.

All of the bids were based on an estimated amount of tonnage for each site. If the tonnage increased, the actual payment on each contract would increase accordingly. The tonnage was fraudulently increased by the removal of non-debris matter (e.g. rocks and dirt). The actual payments made on these contracts are as follows: cleanup site #1, $177,531.40; cleanup site #2, $290,500.80; cleanup site #3, $254,477.98; cleanup site #4, $1,460,129.03; dump site, $288,851.30; and reduction site, $765,228.46. As a result, the original six contracts totaling $1,291,554, were actually paid out in the amount $3,236,718.97. As previously agreed, Matney subsequently subcontracted portions of his sites to Lester.

. . . .

Immediately after the Hurley flood, Stuart Ray Blankenship contracted with Donald Matney in a non-bid setting to perform approximately $100,000 in emergency debris removal. Matney later engaged with Blankenship and others in the bid rigging scheme described earlier. Matney testified that he bought Blankenship three coon dogs for a total value of approximately $16,500, as a bribe for the bid rigging.

Also, immediately after the Hurley flood, there were numerous bridges to be rebuilt on a emergency non-bid basis. Matney testified that Blankenship approached him and offered five bridges if Matney paid a

$5,000 bribe per bridge. Matney then approached Rodney Blake Lee of Lee Construction Company and offered to be partners on the bridge work if Lee would pay one half of the bribes to Blankenship. However, Lee claims to have paid Matney $5,000 for each job, as bribes for Blankenship. From May 2002 until January 2003, Matney and Lee paid Blankenship a $5,000 bribe on five separate occasions to receive bridge work contract in the amount of approximately $500,000. During a taped conversation on December 10, 2003, Lee and Matney discussed the cash bribes and the fact that they could not be traced.

. . . .

Calvin Leo Ward was also an employee of CNX Gas Company, LLC, a subsidiary of Console Energy, Inc. In his job, Ward had the discretion to choose from a pool of contractors as to who would receive specific jobs in the construction of gas wells. Approximately 50% of Donald Matney's jobs came from assignments of work by Ward with CNX. Ward also hired Matney on a regular basis to work for the county in his North Grundy District. Matney testified that in 2001, he received information from one of Ward's employees that payments of money would substantially increase the number of jobs that CNX contracted with Matney. With this incentive, Matney began paying Ward approximately $2,000 every two months. The last of those payments was on December 8, 2003, which was audio and video taped by federal agents, and confirms the payment of the bribe. Also, an agent conducting surveillance for the Federal Bureau of Investigation (FBI) observed Matney handing Ward the envelope containing the money. When interviewed by agents with the Internal Revenue Service (IRS) and the FBI on January 8, 2004, Ward denied receiving any items of value, specifically cash, from any contractor or vendor in his position of employment with CNX Gas Company or as a supervisor. In a tape recorded conversation with Matney on January 28, 2004, Ward assured Matney that he had not told the federal agents anything and he confirmed the absence of any records that reflected Matney's cash payments to Ward. In a May 19, 2004 conversation between Ward and Matney, Ward again addressed the need for Matney not to talk with federal agents.

. . . .

Among the defendants that received the most significant monetary benefits, Donald Ray Matney appears to have gained the most. He clearly supervised at least two individuals (Rodney Blake Lee and Earl Jackson "Roho" Lester, Jr.) involved in the criminal activity that involved numerous participants. He was awarded county contracts which paid him $1,355,602.50. He also received gas well contracts for which he paid bribes, which paid him $3,294,168. However, he paid bribes which totaled only $65,500. In addition, he was involved in a bid rigging scheme that resulted in final total payments of $3,236,718.97 in tainted contracts.

(PSR §§ 84-88, 91-94, 99-100, 119, 128.)

A multicount indictment was returned against the defendants on June 23, 2004. On August 13, 2004, defendant Matney pleaded guilty to Count Two, charging conspiracy to violate the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C.A. § 1962(d) (West 2000) and Count Twenty-Six, conspiracy to commit money laundering, 18 U.S.C.A. § 1956(h) (West Supp. 2005). The court accepted the defendant's plea and directed the preparation of a PSR. The probation officer has determined that the defendant's offense level should be calculated pursuant to United States Sentencing Guidelines Manual ("USSG") § 2S1.1(a)(2) (2004), relating to money laundering, and using the total value of the laundered funds of more than $2.5 million but less than $7 million. Calculated thus, the defendant's Base Offense Level is 26, together with an enhancement because of his conviction

under 18 U.S.C.A. § 1956.  *See* USSG § 2S1.1(b)(2)(B) (2004).  His Total Offense

Level as recommended by the probation officer is 28.


## II

In *United States v. Booker,* 125 S.Ct. 738, 767 (2005), the Supreme Court held

that the Sentencing Guidelines are not mandatory, although a sentencing court is still

obligated to "consult those Guidelines and take them into account," along with the

sentencing factors set forth in 18 U.S.C.A. § 3553(a) (West 2000 & Supp. 2005).

After *Booker*, the sentencing court must "first calculate (after making appropriate

findings of fact) the range prescribed by the guidelines.  Then, the court shall

consider that range as well as other relevant factors set forth in the guidelines and

those factors set forth in § 3553(a) before imposing the sentence." *United States v.

Hughes,* 401 F.3d 540, 546 (4th Cir. 2005) (citations omitted).  Accordingly, I must

determine the defendant's objections to the application of the Sentencing Guidelines.

## A

The defendant objects to a proposed three-level enhancement for his role in the

offense, pursuant to USSG § 3B1.1(b) (2004).

Multiple participants in the same criminal conduct may be found to have the

same or different levels of culpability depending on the circumstances of the case.

The sentencing guidelines take this into account by permitting adjustments for role in the offense.   Under all of the circumstances of this case, I find that the defendant should receive a two-level enhancement under § 3B1.1(c).  As shown by the facts recited above, which I adopt, the defendant was clearly an organizer of the criminal activity in question, but his role was limited.   Thus, I will partially grant the defendant's objection in this regard.

B

The defendant objects to the amount of funds used under  USSG § 2S1.1(a)(2) to calculate his offense level.  According to him, the proper amount should be more than $1 million but less than $2.5 million, which would produce a Base Offense Level of 24.

It is uncontested that in order to calculate the proper offense level, the court must first look to the money laundering guideline, § 2S1.1.  That guideline offers two successive alternatives in order to determine the Base Offense Level:  (1) the offense level for the underlying offense from which the laundered funds were derived if the offense level for that offense can be determined; or otherwise (2) eight levels plus the number of offense levels from the theft, property destruction, and fraud table corresponding to the laundered funds.  USSG § 2S1.1(a) (2004).  The commentary

to this guideline provides that alternative (2) applies to any case in which "the offense level for the underlying offense is impossible or impracticable to determine." USSG § 2S1.1, cmt. n.3(A).

The underlying offenses for the defendant's money laundering conduct are bribery and wire fraud. The guidelines for both offenses require a determination of the loss to the government from the defendant's conduct. *See* USSG §§ 2B1.1(b) (2004), 2C1.1(b)(2) (2002). As shown by the evidence in this case, the loss to the government in this wide-ranging scheme cannot practically be determined. The bribery of those who authorized the work permitted the cost of the work to be essentially economically unregulated. Because of the nature of most of the work, it is now impracticable, if not impossible, to determine in hindsight what the work would have cost the government had the illegal and fraudulent bids not been accepted. There is ample evidence that the costs were excessive, but no realistic way to even estimate the excess.

As shown by the facts recited herein, the amount of the laundered funds calculated by the probation officer is correct and is adopted.

C

The defendant has also moved for a downward departure based on USSG § 5K2.13 (2004), authorizing a sentence below the guideline range based on diminished capacity.

The guidelines allow the court to impose a sentence below the applicable guideline range if the defendant committed a nonviolent offense while suffering from a significantly reduced mental capacity not resulting from the voluntary use of drugs or alcohol. "Significantly reduced mental capacity" means that the defendant has an impairment that substantially limits his ability to "understand the wrongfulness of the behavior comprising the offense or to exercise the power of reason" or to "control behavior that the defendant knows is wrongful" USSG § 5K2.13, cmt. n. 1.

The Fourth Circuit has held that "in order for a defendant's mental condition to be considered 'a significantly reduced mental capacity' . . . the defendant must have been unable to process information or to reason." *United States v. Goossens*, 84 F.3d 697, 701 (4th Cir.1996) (omitting citations). The second step in considering this motion is to determine whether the diminishment was a cause of the offense. "Diminished capacity need not be the sole cause of the offense to justify a departure, but should 'comprise[ ] a contributing factor in the commission of the offense.'" *United States v. Glick*, 946 F.2d 335, 339 (4th Cir.1991) (quoting *United States v.*

-11-

*Ruklick*, 919 F.2d 95, 97-98 (8th Cir.1990)). The Fourth Circuit, expanding upon this factor, noted that the "causal connection must consist of more than an emotional weakness that leaves one open to suggestion." *United States v. Withers*, 100 F.3d 1142, 1148 (4th Cir.1996) (deciding that the defendant's depression over the death of her mother did not amount to diminished capacity because her emotional problems did not affect her ability to reason or process information).

The defendant has provided medical reports concerning his mental and emotional condition, which I have carefully considered. While I recognize that I have the power under the guidelines to depart on this basis, I do not believe that the evidence justifies a departure on the ground of diminished capacity and I decline to exercise my discretion to do so.[1]

## III

For these reasons, it is **ORDERED** that the defendant's objections to the PSR are granted in part and denied in part.[2]

_____

[1] The government has moved for a downward departure from the guideline range based on the defendant's assistance in the prosecution. *See* USSG § 5K1.1 (2004). I have granted that motion, but I have not determined the appropriate extent of the departure.

[2] Objections not herein discussed are denied for the reasons stated on the record at the conclusion of the hearing.

ENTER: July 13, 2005

/s/ JAMES P. JONES
Chief United States District Judge